### In re SADIKU et al.

[Cite as *In re Sadiku* (2000), 139 Ohio App.3d 263.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 20150.

Decided Nov. 22, 2000.

*Michael T. Callahan,* Summit County Prosecuting Attorney, and *Erin G. Rosen,* Assistant Prosecuting Attorney, for appellee.

*David M. Lowry,* for appellant.

BATCHELDER, Presiding Judge.

Appellant, Modupe Sadiku, appeals from an order of the Summit County Court of Common Pleas, Juvenile Division, granting permanent custody of her two children to the Summit County Children Services Board ("CSB"). We reverse.

## I

Appellant is the fifteen–year–old minor mother of twin boys, Tyreek and Maleek Sadiku, born May 25, 1998.[1] An affidavit alleging that the children were neglected and dependent and seeking emergency temporary custody was filed by CSB in juvenile court on October 15, 1998. The basis for the complaint was that the twins were taken into custody pursuant to Juv.R. 6 by the Akron Police Department after the minor mother, appellant herein, was arrested for shoplifting a Mickey Mouse watch on September 10, 1998.[2]

At the shelter care hearing on October 16, 1998, the magistrate ordered that the children as well as the minor mother, appellant herein, remain in the emergency temporary custody of CSB.[3] An attorney/guardian *ad litem* was appointed for appellant. The twins were placed in one foster home and their mother, appellant, was placed in another foster home. On December 8, 1998, a hearing for adjudication and disposition was held, and the parties stipulated to a finding of dependency, the allegations of neglect being dismissed. Appellant waived her right to trial. The parties further agreed that the children would be placed in the temporary custody of CSB. The case plan for reunification required appellant to (1) attend parenting classes to increase her parenting skills and knowledge, (2) meet her academic and attendance requirements for school, and (3) meet the basic needs of her children. Thereafter, CSB filed a motion for permanent custody on February 11, 2000. Appellant filed a motion for legal

---

1. The putative father, Vernell Rahim Cunningham, and a John Doe were served with notice of the permanent custody hearing. No appeal on behalf of the father has been brought.

2. The record is unclear as to the reason the children were kept in the custody of CSB from September 10, 1998 until October 15, 1998. A caseworker testified that the Akron police were unable to find any family member to whom the children could be given, but appellant's sister Rodella Cook testified that the police apparently called appellant's maternal grandmother, Betty Johnson, on September 10, 1998. Johnson eventually reached Cook at another sister's house and they called CSB. CSB reportedly told them that the children were there and they could come pick them up. When the family called back to say that they were on their way, CSB suggested they wait until morning because the twins were asleep. When the family arrived in the morning, the children were not there and they were not told where they were.

3. Appellant had been under the protective supervision of CSB herself and in the legal custody of her sister, Rodella Cook, at the time because of an earlier finding of neglect and dependency in regard to her own mother and dependency in regard to her father.

custody to her sister Rodella Cook, and the maternal grandfather filed a motion for companionship. The trial court appointed a guardian *ad litem* for the children on February 25, 2000. Following a hearing on April 6 and April 25, 2000, the trial court granted permanent custody to CSB, denied appellant's motion for custody to Rodella Cook, and denied the grandfather's motion for companionship as moot. This appeal followed.

## II

Appellant asserts three assignments of error. We will address each in turn.

## A

### Second Assignment of Error

■ "The trial court erred in its entry of an interim order denying appellant's ability and right to call witnesses to rebut the report, recommendations, and testimony of the guardian ad litem. The refusal to permit rebuttal testimony effectively denied appellant due process, was prejudicial to the case of [the] mother, denied her a fair and impartial trial, and constitutes reversible error."

Following the presentation of all evidence, the trial judge asked the guardian *ad litem* to take the stand. She was, however, not sworn in. The trial judge questioned the guardian *ad litem* and allowed counsel to also question her. At the conclusion of her oral responses, the appellant requested the opportunity to present rebuttal testimony to counter the statements of the guardian *ad litem* regarding the suitability of placement with Rodella Cook and the condition of her home. The trial judge acknowledged that appellant had the right to present rebuttal testimony and agreed to allow such evidence to be presented at a later date. Rebuttal and closing arguments were scheduled for April 25, 2000. Prior to that date, however, the trial judge issued a written order rescinding her decision to allow rebuttal testimony. The trial judge explained in that order:

"As the Guardian ad Litem does not offer evidence to the court in the form of sworn testimony, there is no right to offer testimony in rebuttal. Therefore, the court hereby rescinds its prior authorization for the parties to offer rebuttal evidence to the oral report of the Guardian ad Litem."

Counsel for appellant objected to the denial of opportunity to offer testimony in rebuttal to the statement of the guardian *ad litem*. He also explained that because he had not received a copy of the court's written order prior to the hearing, witness Rodella Cook, though pregnant and having to walk to court from the bus stop with a sick child, was present in the courtroom. Nevertheless, the trial court did not allow the witness to testify but proceeded with closing arguments.

Appellant contends that R.C. 2151.35 allows her to offer evidence disputing the information contained in the report of the guardian *ad litem*. Appellant further contends that the failure of the trial court to allow Rodella Cook to take the stand on rebuttal was prejudicial, fundamentally unfair, and requires reversal. The appellee does not dispute the applicability of the statute but instead argues that this section of the Revised Code does not require that the trial court admit such evidence. Rather, the trial court may exercise its discretion in deciding whether or not to allow such evidence.

The proper scope of rebuttal testimony lies within the sound discretion of the trial court. *State v. Vails* (1970), 22 Ohio St.2d 103, 105–106, 51 O.O.2d 133, 134, 258 N.E.2d 225, 226–227. Thus, a trial court's decision regarding the scope of rebuttal testimony will not be reversed unless the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Finnerty* (1989), 45 Ohio St.3d 104, 108, 543 N.E.2d 1233, 1237.

In evaluating the decision of the trial court, this court will look to the controlling law, the facts of the particular case, and a consideration of the rights at risk.

R.C. 2151.35(B)(2) provides:

"The dispositional hearing shall be conducted in accordance with all of the following:

"* * *

"(c) Medical examiners and each investigator who prepared a social history shall not be cross-examined, except upon consent of the parties, for good cause shown, or as the court in its discretion may direct. *Any party may offer evidence supplementing, explaining, or disputing any information contained in the social history or other reports that may be used by the court in determining disposition.*" (Emphasis added.)

Juv.R. 34(B)(3) is virtually identical to R.C. 2151.35(B)(2)(c).

The trial court ruled on April 6, 2000, that appellant had a right to rebut the substance of the guardian *ad litem's* statement. The court rescinded its order only because it considered that the guardian *ad litem's* statement was not evidence. R.C. 2151.35(B)(2)(c), however, permits a party to dispute "any *information contained in the social history or other reports* that may be used by the court in determining disposition." (Emphasis added.) See *In re Lane* (Mar. 7, 1986), Ottawa App. No. OT–85–12, unreported, 1986 WL 2949. The statute does not limit a party's ability to dispute information only to matters of evidentiary quality.

The record before this court discloses that appellant requested the opportunity to present rebuttal testimony specifically as to the statements of the guardian *ad litem* regarding the conditions of the house and living situation as well as the statements demeaning Cook's own efforts to go back to school. Significantly, these matters were not contained in the guardian *ad litem's* written report and were not previously addressed by Cook in her earlier testimony. Therefore, they are properly subject to rebuttal. See *Phung v. Waste Mgt., Inc.* (1994), 71 Ohio St.3d 408, 410, 644 N.E.2d 286, 289, citing *Katz v. Enzer* (1985), 29 Ohio App.3d 118, 29 OBR 133, 504 N.E.2d 427; see, also, *State v. Hohman* (1991), 81 Ohio App.3d 80, 83, 610 N.E.2d 473, 475.

The right of parents to raise their children has been deemed basic and essential, protected by due process of law. *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–1213, 31 L.Ed.2d 551, 558–559; *State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 9, 15 O.O.3d 3, 5, 399 N.E.2d 66, 68. Due process requires "fundamentally fair procedures" when a state attempts to terminate parental rights. *Santosky v. Kramer* (1982), 455 U.S. 745, 754, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599, 606. "Permanent termination of parental rights has been described as the 'family law equivalent of the death penalty in a criminal case.' Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " (Citations omitted.) *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, 682–683.

Upon review of the facts and law and in light of the most serious nature of these proceedings, this court finds that the trial court abused its discretion and violated due process in denying appellant the opportunity to rebut the statements of the guardian *ad litem*. Appellant's second assignment of error is sustained.

## B

### First Assignment of Error

"The trial court erred in granting permanent custody of the minor children subject of the within case unto Children Services Board of Summit County, Ohio, as the evidence submitted did not meet the standards and criteria for permanent placement in accordance with R.C. 2151.414."

### Third Assignment of Error

"The trial court erred when it failed to make a finding that Rodella Cook was a suitable member of the extended family of the dependant children to accept custodial placement thereof."

Having found merit in appellant's second assignment of error, we need not address these assignments of error. App.R. 12(A)(1)(c).

However, because this cause is being remanded and may be reheard, we are compelled to comment briefly. At the time these children were taken into custody, there is every indication that they were clean, well fed, and well cared for. There was nothing physically or emotionally wrong with them. There is no record of any referrals from CSB against appellant prior to her arrest for shoplifting. There is no indication of substance abuse by appellant or physical or mental abuse of the children. The caseworker indicated in writing on the first case plan that the Sadiku family is extremely supportive of each other, that appellant had "ACADEMICALLY EXCELLED," and "[HAD] BEEN CONSISTENT IN GOING TO SCHOOL." (Capitalization *sic.*) Therefore, notwithstanding a stipulation of dependency, it is unclear exactly what the juvenile court intended when it found that appellant failed to "substantially remedy the conditions causing the children to be placed outside the children's home." Subsequent failure to attend school, parenting classes, counseling sessions, and visitations with the children were not relevant to any prior finding.

To be sure, appellant's subsequent record in adhering to her case plan for reunification is less than stellar. But there remain significant questions regarding whether "reasonable case planning and diligent efforts" towards reunification were made by CSB. Appellant was absent from three review hearings on March 18, 1999, June 22, 1999, and September 29, 1999, and her whereabouts were unknown. No satisfactory explanation is given. Appellant had a great many absences from school. However, when she missed three months of school in the spring of 1998 because of physician-ordered bed rest prior to the birth of the twins, there is no evidence of any effort by CSB to provide her with a tutor. In fact, she is considered absent without excuse. She also missed a great deal of school during the next two school years. When appellant reported that other girls picked fights with her and called her names because she was a mother at her young age, there is no evidence of any effort by CSB to place her in a non-traditional school setting. Appellant went to one counseling session at Akron Child Guidance. There she was told that she did not need her babies because they were stressing her out. There was no effort to provide another counselor who shared the goal of reunification. The counselor did not testify in rebuttal to the testimony of appellant. While appellant is criticized for not visiting her children, the caseworker testified that he did not know exactly how many times appellant visited with her children. Significantly, there is no evidence a regular visitation schedule was ever established. The record does suggest that appellant had "liberal" visits with her children while she was living with a foster family and also saw them when her father was able to bring them to her.[4] Appellant also

---

4. The reaction of CSB was that this was done "without our knowledge." There is no indication in the record, however, that appellant's father was prohibited or discouraged from

explained that she left CSB in whose custody she was placed at the time because the entire time she was there, the caseworker would not let her see her children. This testimony stands unrebutted. After appellant was AWOL for a few weeks, she called the caseworker to see her children. The caseworker testified:

"THE COURT: And you would have had the children there?

"THE WITNESS: I would not have had the children there initially. I would have put her through our clinic, gotten her settled back down in a placement, and then provided her with a visit."

Appellant's sister testified that numerous phone calls were made to Mr. Gear to set up appointments, but they got his answering machine and their messages were not returned. These hurdles to obtain and provide visitation are unfortunate. Efforts to lay blame and assess fault, however, lead us away from the central goal of reunification. In the context of this case, some consideration of a joint foster placement for the minor mother along with her children would seem appropriate. Such a placement would keep the mother and children together and also, perhaps, further them towards the goal of independence.

Michelle Wood, the caseworker assigned to appellant as a minor, testified that her only concern regarding appellant was her lack of responsibility for going to school. Again, there is no effort disclosed towards placing appellant in a non-traditional school setting.

Appellant testified that she wants her boys back, that she wants to attend Life Skills to get her high school diploma or equivalency quicker, and that she would like to get a job and save her money. She would then file for emancipation and get her own apartment.[5] She stated that she "will take care of them and * * * give them more love than anybody in this world could." She acknowledged that the father of the children is "not a good influence" and she "[doesn't] want him around[.]" When asked why she tried to steal the $19.98 Mickey Mouse watch, she responded: "Because I needed a watch so I could get to [the twins'] appointments on time and keep them updated on their appointments and stuff, and me too." Appellant also stated that she has no one she can ask questions of regarding things like getting on waiting lists or getting into Life Skills training. This would seem to be the role of CSB or the agencies to which it could refer appellant.

---

taking the children to visit with their mother and it is difficult to imagine any reason why that would be so.

5. Appellant indicated on her intake card at Akron Pregnancy Service that she did not plan to parent the same way her parents did. She wrote: "My mom didn't really raise me, I raised myself." The caseworker admitted that that was "probably true."

An agency seeking permanent custody of a child bears the burden of proving its case by clear and convincing evidence. R.C. 2151.414(B)(1). Though we need not reach the question of whether CSB met its burden, we have serious questions in that regard.

Reasonable case planning and efforts by CSB to secure nontraditional schooling for appellant, to provide regularly scheduled visitation with her children, to obtain a counselor who believed in a reunification plan, to consider placement of mother and children together, and to help appellant secure financial and support services would seem to be useful considerations in attempting to achieve reunification of parent and children.

## III

Accordingly, appellant's second assignment of error is sustained. Her first and third assignments of error are moot. The judgment of the Summit Count Court of Common Pleas, Juvenile Division, is reversed, and the cause is remanded.

*Judgment reversed*
*and cause remanded.*

BAIRD and CARR, JJ., concur.