The gravity of the lower court's decision cannot be overstated — an individual's fundamental liberty interest has been abolished, and five children have been separated from their mother forever. It is critical that this Court examine the lower court's decision that permanent separation is in the children's best interest, in conjunction with a review of Michelle's fundamental liberty interest. To affirm, this Court must find that the lower court fully considered whether "it is in the best interest of the child[ren] to permanently terminate [Michelle's] parental rights and grant permanent custody to [CSB]." R.C. 2151.414(D) mandates a review of all the facts in the record. "In determining the best interest of a child * * * the court shall consider all relevantfactors, including but not limited to," the five enumerated. (Emphasis added.) R.C. 2151.414(D).
In determining whether the lower court erred in terminating Michelle's parental rights, and in finding that such a determination is in the children's best interests, my review of the record has caused me to write the following dissent.
 I.
The most compelling facts pertaining to Ariz. Woodall, the oldest child, were that she was a six-year-old girl who was functioning appropriately, who shared a tight bond with her mother and her siblings, and, who after having been removed from her mother, alienated from her siblings, and placed in a foster home, was labeled retarded, and enrolled in "special" classes in a school for children with severe behavioral problems.
Before she was removed from her mother's home, she was a happy, healthy, well-adjusted six-year old girl, who people said was mature for her age. She was lively, bright, and socially appropriate.[6] She was doing well in her classes at the local public elementary school. She lived with her mother, and her younger brother and two sisters. She had overcome major medical challenges in her short, young life; she had been born prematurely with severe gastrointestinal problems that necessitated the use of a catheter and a feeding tube, and required constant care. But she was strong and determined, and so was her mother, who at thirteen years of age, was a child herself.
Because of her youth, doctors doubted that the thirteen-year-old mother would be able to properly care for her sickly child. But the young mother was impressive in her desire to care for her child. She took classes at Akron Children's Hospital to teach her how to care for her baby daughter's severe medical needs, and several times a day meticulously cleaned her daughter's catheter and feeding tube. To everyone's surprise, she was able to nurse her sick child to complete health.
In January of 1999, however, life as the little six-year-old had always known changed. CSB received an anonymous call reporting that she and her siblings had been left at home alone. Without warning, she was removed from her home and mother. She was immediately separated from her sisters and brother and shuffled from one caretaker to the next — but never permitted to go home. She was authorized to see her mother and her siblings for one hour each week under the close supervision of social workers. She was counseled weekly that her mother was inadequate and that she must adjust to her "new mom" — her foster mom.
At first she did not like her foster mom or her new home. She longed for her real mom. She cried incessantly. Often she could not sleep through the night. For the first four or five months she would get so upset she would throw up.[7] She did learn to calm down though — it just took making her clean up her own vomit.[8] Then she became violent.
"Mildly mentally retarded" was the diagnosis. She was placed in special classes in a special school — a school for the behaviorally challenged. She was no longer permitted to see her mother or her siblings.
She is subdued now — she has been placed on medication. She has few violent outbursts. The diagnosis is "she's doing better." She doesn't cry as much, and she even hugs her foster mother. The decision is "this is in her best interest."
Yet, the record reveals that when Ariz. and her siblings were taken from their mother, Michelle Woodall, they were well dressed, well fed,[9]
well behaved, happy, and closely bonded to each other and Michelle.[10]
There were no allegations that Michelle abused the children. The sole complaint was the report that Michelle had left the children home alone. The unrefuted evidence is that prior to her removal from Michelle, Ariz. did well in school, and she did not display any behavioral or developmental problems. In fact, none of the children were diagnosed with any behavioral or developmental issues. However, once CSB removed the children, their behavior deteriorated to the point that they became violent and, at times, uncontrollable, and every child was diagnosed as having developmental delays.
The record in the present case is particularly distressing. Nearly every page of CSB's counseling notes on Ariz. describe Ariz's love for her mother and the difficulty she suffered as a result of the separation. The initial intake notes from Akron Child Guidance Center (ACGC) state that Ariz. "appeared to be quite alert and lively and socially appropriate[,]" and that "[h]er mood was appropriately fluctuating." Page after page of counseling notes in the record state that Ariz. was having a very difficult time adjusting without her mother and that Ariz. admitted that she would intentionally misbehave because she thought that would help her see her mother.
What is missing from the record though is clear and convincing evidence that the decision to terminate Michelle Woodall's parental rights was in the children's best interest. Therefore I must vigorously dissent with the majority's disposition of Michelle's first and second assignments of error. With the balance of the opinion, I concur.
 II.
Given the current state of the law, the analysis of the instant case must begin with the best interest of the Woodall children.
Best Interests of the Woodall Children
Although I am disturbed by the fact that R.C. 2151.414(B(1)(d) does not require a determination of parental unfitness prior to terminating the parent's rights in his or her child, as discussed infra, that issue is not on appeal and such is the current state of the law. Therefore, as the majority correctly points out, the trial court needed only to find, by clear and convincing evidence, that it is in the children's best interest to grant permanent custody to CSB. R.C. 2151.414(B).
In my view, a review of the record shows that there is not clear and convincing evidence that it is in the children's best interest to grant permanent custody to CSB. The record shows that until January of 1999, when the instant case was filed, the children were in Michelle's care. The record does establish that Michelle's mother, Roslyn Woodall, was involved with CSB on many occasions, but that CSB never seized the opportunity to help Michelle while she was still a child.[11]
Although the instant case was not initiated until January 1999, the critical period of time for this family began in 1992. On October 28, 1992, CSB received a referral that Michelle, then thirteen years old, was pregnant, and that a twenty-five-year-old male was the father. Instead of reporting the possible rape of a child, or offering Michelle assistance with her pregnancy, CSB closed the case due to a reported lack of cooperation of Michelle's family.
On February 3, 1993, while Michelle was still with child, police made a drug raid upon the home of Michelle's mother, Roslyn Woodall. Michelle's mother was arrested for drug abuse, aggravated drug trafficking, and child endangering, and Michelle and her siblings were placed in CSB's custody. Legal custody of Michelle, who was still a minor, was transferred to Michelle's maternal grandmother, Evelyn Smith, until Smith called CSB and said that she could no longer care for Michelle or Michelle's sister because the girls had threatened her with an ice pick.[12] By this time, Michelle had already given birth to Ariz, and both Ariz. and Michelle were placed in CSB's custody. Less than a month later, however, Smith requested that Michelle and Ariz. be returned to her home. CSB complied with the request to return Michelle and Ariz. but there is no evidence in the record that it provided any services. Michelle's mother, Roslyn, was subsequently released from prison and Michelle and Ariz. were returned to her.
Over the next several years Michelle gave birth to four more children: twins, Derrick and Dasha, in 1995; Taija in 1996; and Renisha in 1998. All of the children, except Renisha, were born to Michelle while Michelle was still a minor. CSB knew of all the births, but there is no indication in the record that Michelle was given or even offered any type of assistance. While it is true that CSB received a call concerning Michelle and her children in 1998, there is nothing in the record to substantiate that there was any problem because Michelle was living in another jurisdiction, and CSB did not contact the family.
Then in January 1999, CSB received an anonymous call reporting that Ariz. and her siblings had been left at home alone. Once Ariz. was taken into custody, it was noticed that Ariz. had a burn on her finger. When questioned Ariz. did state, according to CSB caseworkers, that she had burnt herself while cooking for her siblings. Michelle's unchallenged testimony is that she was aware of Ariz's burn because it had happened while she was home.
In determining that permanent custody should be removed from Michelle and granted to CSB, the trial court relied on the following factors: the children have bonded with the foster parents, the children appear to excel when separated from their parents and each other, and following the termination of visitation with Michelle, the children's behavior showed notable improvement. These factors do not constitute clear and convincing evidence which justify termination of Michelle's parental rights.
It is well documented in CSB's records that Michelle and her children shared a very strong, loving bond. In fact, CSB's notes describe the anguish the children went through upon separation from Michelle. Yet, this bond between the children and their natural parent seems to have been given little weight despite the fact that the natural parent's right to the care and custody of his or her child is one of this nation's oldest fundamental liberty interests. See Troxel v. Granville (2000),530 U.S. 57, 65, 147 L.Ed.2d 49, 56.
CSB reported that the children's behavior showed signs of improvement after visits with Michelle were terminated. This is based on CSB's repeated complaint, while visitations were in effect, that the children acted up during visits and that Michelle could not control them. The caseworkers deemed this behavior "inappropriate." The record establishes that Michelle was only permitted to visit her children for one hour per week, under close supervision of CSB employees. The visits were with all five children, and were the only times that the children had contact with each other. No one disputes, and in fact the record expressly documents, that the children were very attached to one another and to their mother, that the children were very excited to see one another, and that each child would fight for Michelle's attention at the sessions.[13]
However, because the kids, whose ages ranged from six years of age down to one, would not keep quiet and play structured games, the caseworkers labeled the visits as "chaotic."
 B. CSB and Michelle Woodall
Since permanent termination of parental rights has been described as"the family law equivalent of the death penalty in a criminal case,"parents must be afforded every procedural and substantive protection the law allows. In re Hayes (1997), 79 Ohio St.3d 46, 48, quoting In reSmith (1991), 77 Ohio App.3d 1. See, also, In re Sadiku (2000),139 Ohio App.3d 263. An action to terminate parental rights in cases of abuse, neglect, or dependency must balance the liberty interests of parents against the rights of the children to be free from harm from their parents. See Lassiter v. Dept. of Soc. Serv., (1981), 452 U.S. 18, 27. "The fundamental liberty interest of natural parents in the care, custody, and management of their child[ren] does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the [s]tate." Santosky, supra, at 753. Because an award of permanent custody is the most drastic disposition available under the law, it is an alternative of last resort and is only justified when it is necessary for the welfare of the children. See In reCunningham (1979), 59 Ohio St.2d 100, 105.
1. The Agency's Involvement
One of the major concerns I have with this case is that CSB failed to offer Michelle assistance in remedying the problem that initially caused the children to be placed outside the home. The children were removed because they were left at home without adult supervision. However, nowhere in the record is any discussion, service offered, or suggestion made to Michelle concerning supervision of the children. Because Michelle works outside of the home and not all of her children are of school age, such a plan is essential.
What is particularly disconcerting to me, in this regard, is that CSB provided each of the foster homes various services to aid in caring for the children, but the agency never offered such services to Michelle. For example, in furtherance of what is supposed to be the objective of the case plan — reunification of the family — CSB could have offered Michelle unmarried parent services, homemaker/health aide, crisis services, environmental management, or parent aide services.[14] In fact, these services are so basic that they are listed as part of the boilerplate checklist on CSB's standard case plan form.
Furthermore, it also appears that CSB failed to make any reasonable efforts to reunify the family. Michelle repeatedly attempted to prove to CSB that she was able to effectively parent her children; Michelle requested on numerous occasions that the children be returned to her at least one-by-one on a trial basis.[15]
After reviewing the record, one has to be reminded that the mission of Summit County Children Services' is to respect "the dignity, integrity and uniqueness of each family and [to] adhere to the philosophy that governmental intrusion is warranted only when children are thought to be at risk." Summit County Children Services, All About Us,http://www.summitkids.org/aoutus.html. "The primary goal [of the agency] is to protect children from harm by helping parents to manage their problems in ways other than abusing or neglecting their children."Id. Certainly, in this case, CSB failed to help Michelle manage the problem for which her children were taken away — leaving her children home alone.
In addition, the lack of intervention by CSB following the sexual victimization of Michelle at the age of twelve or thirteen is especially troubling. CSB learned from its brief investigation that it was probable that Michelle's mother condoned or promoted the sexual relations between her then thirteen-year-old daughter and the twenty-five-year-old man who was allegedly providing the mother drugs. Although this information gave CSB even more cause to intervene, the agency decided to close the case. The mere fact that Michelle was a parent at age thirteen coupled with the fact that her mother had been incarcerated for drug trafficking, warranted at least the offer of some type of intervention and protective services. Unfortunately, we cannot know how Michelle's life may have been different had some action been taken in 1992.
2. Authorization of Governmental Intrusion
I am also concerned that the current statutory scheme fails to adequately protect the rights of parents and their children when they become either voluntarily or involuntarily involved with children services agencies. In March of 1999, the General Assembly enacted an amendment to R.C. 2151.414 which enables a court to presume parental unfitness where a child has been in the temporary custody of a children services agency for more than twelve months of a twenty-two month period. R.C. 2151.414. The statute also relieves the state from the burden of establishing that a parent has failed to substantially remedy the conditions, which caused the removal of the children. See In reDecker (Feb. 13, 2001), Athens App. No. 00CA0042, unreported.
The impact of this amendment is just beginning to be realized, as the statute became effective only twenty-six months ago. In fact, this Court recently issued two opinions in which I dissented on this very issue. See In re Bunting (May 23, 2001), Wayne App. No. 01CA0010 and 01CA0011, unreported; In re Laird (May 23, 2001), Wayne App. No. 01CA0005, unreported. I explained the effect of the amendment in In re Bunting,supra:
 Prior to the March 1999 addition of R.C. 2151.414(B)(1)(d), the state could not permanently terminate parental rights unless it proved, by clear and convincing evidence, (1) that the parent was unfit in some way and (2) that permanent custody was in the child's best interest. With the recent addition of subsection (B)(1)(d), however, the state is able to satisfy its burden of proving parental unfitness simply by establishing that the child has remained in the temporary custody of the agency for more than a year.
 In an effort to prevent dependent and neglected children from lingering in the foster care system indefinitely, the legislature imposed a twelve-month time limit on reunification that has obviated the state's need to prove parental unfitness before permanently terminating parental rights. Instead, courts are apparently to presume the unfitness of a parent because her child has been in the temporary custody of a children services agency for more than twelve months of a twenty-two month period. And, even worse, R.C. 2151.414 provides no mechanism for a parent to rebut this presumption. If the child has remained in temporary custody for the requisite period, the state has satisfied what was once the "unfitness" prong of the permanent custody test. Because the state is no longer required to present such evidence, the circumstances surrounding that period of temporary custody are not necessarily revealed at the permanent custody hearing * * *. A child may have remained in the temporary custody of the agency for a variety of reasons, including that the parent was making great progress toward reunification.
 I am concerned that the statute fails to adequately protect "the rights of the parents and, as a result, the rights of their children." In re Bunting, supra. This is because "R.C. 2151.413(D)(1) and R.C. 2151.413(D)(3)(a) essentially require the agency to move for permanent custody unless it can document `a compelling reason that permanent custody is not in the best interest of the child.'" Id. In effect, "the current statutory scheme pushes the agency to end a [parent]'s relationship with [his/her] children[.]" Id.
3. Review of Case Plan
Because permanent custody proceedings involve a fundamental liberty interest and place great discretion in social workers employed by children services agencies, it is absolutely essential that courts exercise judicial responsibility when reviewing their records. The trial court must balance protecting the children from abuse and neglect with protecting a parent's fundamental liberty interest. It is not enough for a court to mechanically accept case plan directives and then permanently terminate a parent's rights for not complying or "solv[ing] every problem that a caseworker thinks should be solved." Wiens, State v. Parent Termination of Parental Rights: Contradictory Actions by the Ohio Legislature and the Ohio Supreme Court in 1996 (1997), 26 Cap.U.L.Rev. 673, 678 (noting that "[a]gencies already have tremendous power to shape the outcome of an abuse, neglect or dependency case. The children services agencies control visitation[,] * * * decide whether or not to continue with efforts to reunite the family[,]" and "whether to move for permanent custody[.]").
The record demonstrates the children here were removed from their home on the basis of an isolated incident, i.e., leaving them alone without adult supervision. CSB was then required to create a case plan directed towards correcting the parenting deficiencies that resulted in the removal of the children and to make reasonable efforts to reunify the family. R.C. 2151.419.
A case plan was developed and filed on May 25, 1999, four months after removal of the children. This plan required Michelle to: follow all the rules of her probation[16]; to remain drug free; to address any emotional issues; to regularly visit her children and provide appropriate adult supervision; to attend parenting classes and to follow through with all recommendations; and to obtain clean, stable, independent housing. The record demonstrates that she complied with the case plan objectives in all significant regards.
Michelle successfully completed a twelve-week intensive outpatient drug treatment program, Exodus. As part of the program, Michelle was required to drop urine screens twice a month and attend three AA or NA meetings a week. Michelle was evaluated at the Community Health Center. The purpose of the assessment was to determine the extent of any chemical dependency. The assessment concluded, "chemical dependency treatment does not appear needed." Christina Miller, a CSB caseworker, testified that Michelle had not had a positive urine screen since Renisha was born in April of 1998. Miller also testified that she had no reason to believe that Michelle was anything other than drug free at the time of the permanent custody trial.
Michelle attended parenting classes at CSB and at Urban Ounce of Prevention. Although not ordered to do so by the court, Michelle enrolled in and successfully completed a parenting program through Exodus, called New Beginnings. In October of 1999, Yvonne Johnston, Michelle's counselor at New Beginnings, reported to CSB that she felt that Michelle "has a lot of strengths and that she is very determined to work, and that [Michelle] loves her children and is determined to get them back." Johnston also reported that she believed that Michelle could "handle the children" if the children were sent back home and Johnston talked to Michelle about the children's individual needs." Johnston suggested that the children be returned to Michelle one or two at a time. Furthermore, Christina Miller testified that she observed Michelle apply the skills she had learned from her parenting class during visits at the CSB visitation center.
Michelle attended each and every hearing. She completed psychological, psychiatric, and parenting evaluations from Portage Path, Exodus, the Blick Clinic, and Pastoral Counseling in an attempt to satisfy CSB. Christina Miller testified that Michelle was unable to complete her psychological evaluation for several months, through no fault of her own, because CSB had had trouble finding someone to perform the assessment. It is important to note that on November 12, 1999, CSB filed its first motion for permanent custody in the case. In its motion, CSB asserted that one of the reasons that Michelle's parental rights should be terminated was because, at that point, Michelle had "not obtained a parenting eval or a psychological eval[.]" CSB failed to mention in that motion that it was CSB's fault that the evaluations had not been performed.
CSB's complaints with Michelle's compliance with the case plan objectives were that: Michelle was uncooperative in working with CSB and that she was unable to supervise the children in the CSB visitation center; Michelle had "inappropriate" interaction with the children; she did not fully comply with the terms of her probation; and that Michelle did not show that she was able to effectively demonstrate that she could implement the parenting skills she learned in the courses she completed. The trial court obviously agreed, as it made reference to each complaint in its final entry. However, the facts in the record do not support the findings.
In regard to the trial court's findings that Michelle was unable to supervise the children in the CSB visitation center and that Michelle was uncooperative in working with CSB, the evidence demonstrates that Michelle could not possibly have met these requirements in the setting CSB arranged. The children would fight for Michelle's attention during the visits because the one-hour per week sessions were the only times the children were permitted to see each other or their mother. The one-hour sessions took place in a visitation center with other families, and under close scrutiny of social workers who reportedly would undermine Michelle's authority by correcting Michelle in front of her children. The social workers consistently tried to make Michelle adhere to their values and beliefs on parenting.
Caseworkers who supervised the visitations also reported Michelle's interaction with the children was "inappropriate," and that Michelle was uncooperative because she would bring her children food. For example, CSB caseworkers reported mom's behavior as inappropriate because Mom would bring "complete meals to the visits, even though she ha[d] knowledge that the children ha[d] already eaten."[17] Michelle testified that she brought the children "Church's Chicken, mac and cheese, [and] mashed potatoes." But that after CSB instructed her not to bring so much food, she "broke it down to Lunchables and juice."[18]
One other unsettling incident cannot go unmentioned. At the time of the permanent custody trial, Michelle still owed money she was required to pay as part of her probation. During the second day of the permanent custody trial, CSB's attorney brought a deputy sheriff into the courtroom. Attempting to imply that Michelle is hostile, CSB's attorney stated that the deputy was present for "security." Transcript of Proceedings Vol. 2, 185. However, apparently aspiring to trigger Michelle's temper, CSB's attorney attempted to have Michelle arrested and placed in custody right in the middle of the permanent custody trial for failure to pay the $481.00 balance of her fine. Given the facts of this case, where Michelle had completed extensive counseling — much of which was self-initiated, she was drug and alcohol free, she had adequate housing for the children, she attended each and every hearing and visitation, it hardly seems appropriate that a balance of less than five hundred dollars on a fine, should hold such weight (as expressed in the trial court's journal entry) in deciding whether to terminate Michelle's parental rights.
CSB and the trial court also deemed Michelle's action of checking her daughters' vaginas for signs of sexual abuse inappropriate.[19] Given that Michelle was sexually victimized as a child and that no one came to her aid, it seems only appropriate that Michelle would be worried about protecting her daughters. More importantly, Ariz. reported to both Michelle and CSB that she had been sexually assaulted while in foster care. The record fails to indicate whether CSB conducted any investigation into Ariz's allegations.
CSB reported that Michelle would say "inappropriate" things to her kids at visitations. A review of the "inappropriate" language reveals that Michelle told Ariz. that "she needs to behave if she wants to [go] home[.]"[20] Although CSB criticized Michelle for discussing "inappropriate" topics, such as the children's possible return home, at the same time CSB was telling the children that Michelle was a "poor parent." Meeting notes show that even prior to filing for permanent custody, the goal of counseling was to get Ariz. to recognize her mother was deficient. It is difficult to reconcile how getting a six-year-old child to recognize her mother's deficiencies coincides with CSB's duty to attempt to reunite the family.
Throughout its records, CSB reported that Michelle is "uncooperative" because she would not specifically denounce her upbringing and because Michelle would not admit that her early sexual relationship with a twenty-five-year-old man was inappropriate. The lower court also found that "Michelle denies that her relationship with Mr. Jacobs was inappropriate when she was thirteen-years-old and he was twenty-five-years-old." A careful review of the record shows that at times Michelle admitted that she was raped, and that the relationship was inappropriate. However, even if Michelle had not admitted that the relationship was inappropriate, I find it incomprehensible that CSB would condemn Michelle for failing to declare the relationship to be inappropriate when CSB failed to act in a manner consistent with that opinion in 1992.
The trial court found also that Michelle failed to comply with court orders by having contact with the children beyond her designated supervised visitation periods. The trial court found that the additional contacts Michelle made with her children, because they were made outside of CSB's scheduled times, were a factor upon which Michelle's parental rights could be terminated. Although it is essential that parties comply with court orders, such as limiting visitation to CSB's discretion, a review of the record shows that Michelle did not just ignore the court. Rather, Michelle's family members initiated most of the contacts while the children were in their custody. For example, Evelyn Smith testified that when she received custody of the five children she did not have a job, but that she started working and "needed somebody to help [her] take care of [the children]. So [she]asked Michelle to help [her] take care of them." That is, until "CSB started `getting down' on [her]."[21]
CSB was aware that Michelle's extended family was causing problems and that someone was always being dishonest. However, at that time CSB felt that it was a good decision to leave the children in the extended family's care, despite the fact that CSB repeatedly noted in its records that Michelle's extended family was involved in drugs, and that the family caused trouble for Michelle.[22]
The trial court found that Michelle had not shown that she is able to effectively demonstrate that she can implement the skills she learned in the parenting courses she completed. Michelle, however, was never given the opportunity to demonstrate that she could implement the skills she learned and that she could care for all of the children. The only time Michelle had any opportunity to demonstrate her parenting skills was with all five children at one time during the one-hour weekly visits.[23]
CSB caseworkers agreed that Michelle would have been better able to demonstrate her parenting skills with the children on an individual basis,[24] yet CSB denied Michelle's repeated requests to visit each child separately.[25]
Although CSB offered each of the foster homes various services, CSB never provided Michelle with any, such as unmarried parent services, homemaker/health aide, crisis services, environmental management, or parent aide.[26] Nor did CSB offer Michelle any assistance in dealing with her children's problems. CSB claimed that one reason the children must not be returned to Michelle is because Michelle does not know how to cope with the children's behavioral or developmental problems. But, CSB never attempted to teach Michelle how to deal with the children's difficulties. Yet, CSB gave each foster parent training and assistance in dealing with the disabilities.
At the trial below, much attention was devoted to the fact that these children had behavioral issues and needed a secure, loving, and stable environment. Every child, with or without behavioral issues needs a secure, loving, stable environment. There is no evidence that Michelle could not provide such an environment. The children's developmental delays were not diagnosed until after they were removed from their home. Michelle testified that she is now aware of the children's special needs and that she is willing to do whatever it takes to address them.
The trial court also found that "no evidence was submitted which indicates that Michelle can provide adequate housing for the children." However, no evidence was submitted that proved Michelle did not have adequate housing. In fact, CSB's records indicate that Michelle lives alone in a two-bedroom apartment, and had adequate bedding for the children.
The trial court found that the children represent the third generation of a dysfunctional family, and that they have benefited from counseling. It is true that Michelle comes from a family with problems. It is CSB's duty, however, to attempt to help rectify the problems in such a family, and not remove children simply because they represent another "generation" of that family. Furthermore, that the children have benefited from counseling has absolutely nothing to do with Michelle's ability to parent. The children were never diagnosed with any problems while they were in Michelle's care, and there was no evidence to suggest that Michelle would not continue counseling for the children if they were returned to her.
While the trial court also found that "Michelle admitted that she smoked marijuana while pregnant with Renisha[,]" the record shows that Michelle completed an intensive drug program, and has passed all of her drug tests since April of 1998.[27] Christina Miller testified that she had no reason to believe that Michelle was other than drug free at the time of the trial.[28]
Joanne Hannah, an Early Start coordinator for Children's Hospital, testified that she met Michelle when Ariz. was first born because of Ariz's severe medical condition. Ariz. was born prematurely, and with gastrochisis. Hannah offered Michelle services to help with Ariz's care, and Michelle accepted "every service that [she] had to offer." Hannah stated that hospital staff was concerned that due to Michelle's young age, she would not be able to properly care for Ariz's severe problems. However, Michelle took and passed a number of classes that taught her how to deal with Ariz's catheter and feeding tube. Hannah further testified that she followed Michelle for three years, with weekly contact for the first three months and monthly contact thereafter.[29]
Hannah further testified that based on her thirteen years of experience, she can say that Michelle was a great mother to Ariz. In fact, in response to a question as to how Michelle interacted with Ariz, Hannah stated that she "really want[ed] to talk about this because" in her experience she had never seen such a young mother take such great care of a baby that had such severe medical needs.[30] Also, Hannah indicated she interacted with Michelle on a regular basis for over three years, and she observed Michelle's parenting skills first hand. Hannah testified that she also observed Michelle at the hospital with all five children and was amazed at how well behaved the children were, and how well Michelle managed all of them.
 III. Conclusion
Although the record shows that Michelle was not a "perfect parent," the record fails to establish that the children could not be placed with her and fails to show that it was in the children's best interest that Michelle's parental rights be terminated.
It is important not to lose sight of the basic facts of this case. The children were taken from Michelle after it was found that they were left at home alone for an undetermined amount of time. The children were immediately separated from each other and their mother, and simultaneously began exhibiting behavioral problems. Although CSB never addressed the problem for which the children were taken away — being left at home alone — the agency placed many requirements upon Michelle. Michelle successfully completed virtually every stricture imposed upon her: Michelle underwent psychiatric and psychological evaluations, completed counseling and parenting classes, found adequate housing and a job, had clean drug screens, and visited her children. Michelle completed several counseling programs that were not even required by the court. Michelle did everything possible to get her children back. Still it was not enough for CSB.
This is not a case where Michelle physically or emotionally abused her children. This is not a case where Michelle failed to address her issues. This is a case where Michelle left her children home alone on at least one occasion. This is a case where the children were functioning normally prior to their removal from their mother, but who were labeled "challenged" after the separation. This case presents the question of whether leaving your children home alone warrants permanent removal. Obviously, the answer to that question depends also upon consideration of the surrounding circumstances. In this case, my judgment is that permanent removal is not warranted.
For all of the foregoing reasons, I dissent from the decision to terminate Michelle's parental rights.
In closing, I note that the record indicates that Michelle's thirteen-year-old sister is pregnant and lives with their mother Roslyn Woodall. Hopefully, the poor judgment exercised in 1992 will not be repeated — particularly given that CSB has been notified that Roslyn's home may not be safe for children.[31]
[6] Akron Child Guidance Center notes 6-11-99; testimony from Joanne Hannah, an Early Start coordinator for Children's Hospital.
[7] Akron Child Guidance Center notes 9-19-99.
[8] Coordinated Services Team meeting notes 3-24-00.
[9] 5-29-99 Case Plan.
[10] Akron Child Guidance Center initial assessment of Ariz.
[11] Michelle along with her infant child, Ariz, was removed from Michelle's mother's home in 1992. However, Michelle's children were never removed from Michelle's custody prior to 1999.
[12] There is nothing in the record to substantiate this allegation, and there is no indication that a police report was ever filed.
[13] Coordinated Services Team meeting notes 8-25-99 and 10-14-99.
[14] 5-22-99 Case Plan.
[15] In October of 1999, Yvonne Johnston, Michelle's counselor at New Beginnings, also advised CSB that she believed the children should be returned to Michelle one or two at a time.
[16] The rules of Michelle's probation are not set forth in the record.
[17] Coordinated Services Team meeting notes 8-25-99. See, also, Coordinated Services Team meeting notes 10-14-99.
[18] Transcript of Proceedings, Vol. 2, 173.
The idea that a parent was criticized for bringing her child too much to eat is beyond comprehension. The discussion of such a trivial point so offends the solemnity of permanent custody proceedings that it is an embarrassment to mention, but is indicative of the value judgments social workers attempted to impose on Michelle. There is no indication in the record that the children were suffering from childhood obesity or any other eating disorder. Instead, this is but one example of differing value judgments as to how to raise one's children. The belief that "a good parent feeds her child small portions of health snacks, i.e. Lunchables," is a value judgment that should not be imposed upon parents simply because it is the belief of the social worker.
[19] Akron Child Guidance Center notes 10-22-99.
[20] Coordinated Services Team Meeting Notes 11-18-99.
[21] Transcript of Proceedings Vol. 2, 104-105.
[22] 1-14-99 and 6-22-99 Journal Entry; Akron Child Guidance Center notes 8-25-99.
[23] Transcript of Proceedings Vol. 1, 99.
[24] Transcript of Proceedings Vol. 1, 105.
[25] Transcript of Proceedings Vol. 1, 200.
[26] See 5-22-99 Case Plan.
[27] Transcript of Proceedings Vol. 1, 100-101.
[28] Transcript of Proceedings Vol. 1, 101. Again, it is troubling that CSB holds this against Michelle now when CSB was aware of the fact that Renisha tested positive at birth for marijuana in 1998, but took no action to remove Renisha, or to monitor her health and safety. However, now that the present case against Michelle shows that Michelle is drug and alcohol free, CSB uses that information against her, and the trial court found it to be of critical importance.
[29] Transcript of Proceedings Vol. 2, 136-138.
[30] Transcript of Proceedings Vol. 2, 139.
[31] The trial court noted in its January 14, 1999 journal entry that:
 Police made the extra effort to come to Children Services Board to request that the children not be placed with the maternal grandmother due to the fact that these officers had made drug arrests at the home of the maternal grandmother and had frequently been in and out of her home due to on-going drug activity which they alleged included use and sales of drugs by the maternal grandmother herself. They were concerned that the children would not be safe if placed in this residence.