KLEM, Appellant,

v.

CONSOLIDATED RAIL CORPORATION et al., Appellees.

[Cite as *Klem v. Consol. Rail Corp.*, 191 Ohio App. 690, 2010-Ohio-3330.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–09–1223.

Decided July 16, 2010.

692

694

695

E.J. Leizerman and Michael Jay Leizerman, for appellant.

Thomas J. Antonini, for appellees.

---

Cosme, Judge.

{¶ 1} Appellant, John Klem, appeals the judgment of the Lucas County Common Pleas Court, asserting that the trial court erred in refusing to grant him judgment notwithstanding the verdict and denying him leave to amend the complaint. Klem asserts that the trial court committed prejudicial error by failing to properly instruct the jury, refusing to allow a witness to testify, and refusing to dismiss jurors for cause. For the reasons that follow, we affirm in part, reverse in part, and remand for a new trial.

{¶ 2} This case arises under the Federal Employer's Liability Act, Section 51, Title 45, U.S.Code, et seq. ("FELA"), and the Locomotive Inspection Act, Section 20701, Title 49, U.S.Code, et seq. ("LIA"). Klem alleges that during his employment with appellant, Consolidated Rail Corp. ("Conrail"), the locomotive he was operating had an independent brake that was not in working condition and was not safe to operate. Klem claims that he was injured when he tried to release the defective independent brake. The jury returned a verdict in favor of Conrail.

## I. BACKGROUND

{¶ 3} On November 10, 2003, Klem, a veteran locomotive engineer, was assisting other Conrail employees in putting together a train for Marathon Oil at the Conrail facility in River Rouge, Michigan. While moving the locomotive, Klem noticed that the track switch indicated that the tracks were misaligned. Because of the danger of derailment, Klem needed to immediately stop the locomotive. When Klem attempted to release the independent brake, it became stuck and he suffered serious injury to his thumb.

{¶ 4} Klem asserted that the independent brake malfunctioned when it locked up. He described the occurrence: "So I get moving up to about eight miles an hour and then I knock the throttle off, because I'm seven, eight, I don't know exactly. * * * And as soon as I see it, I tried to slap on it [the independent brake] and it goes about that far * * * And I had a sharp pain go up—the pain was so intense in my hand I believe it passed my elbow. Not even sure."

{¶ 5} After the independent brake became stuck or got "caught up," Klem tried the brake again and was eventually able to move it into position to stop the locomotive. After Klem reported his injury and the trouble with the independent brake, several other Conrail employees came on board to see what the problem

was. They were able to release the independent brake only with some difficulty. The conductor, Ralph Sturgall, had it jam up on him. The trainmaster, Thomas Szpond, and the engine maintainer, Roy Duhadway, tried unsuccessfully to work it. They also attempted to fix the independent brake. Because they were unable to repair it, the locomotive was placed "out of service" and "blue-flagged." The records do not reflect whether the independent brake was repaired or replaced, but they clearly state that there had been some difficulty in using it. The problem was described in the written reports as a "hesitation."

{¶ 6} Like the other Conrail employees, Duhadway could not recall details of the incident, but he acknowledged that someone else had written "hesitation" on the form and given it to him to sign. Duhadway conceded that "hesitation" could mean that the independent brake was not working normally.

{¶ 7} Prior to the incident, no issues had been reported with respect to the locomotive. It had been inspected on a regular basis and all the paperwork was in order, suggesting no history of problems or issues with the independent brake. There remains some question as to whether the locomotive was actually repaired. Conrail's copy of the locomotive-inspection report noted that the locomotive was shipped later that month (presumably as a result of the incident) to Maryland for repair. Klem's copy of the report, which was given to him during discovery, contained no such notation that the locomotive was to be repaired.

{¶ 8} As a result of the injury, Klem filed suit under the FELA and the LIA, alleging that the locomotive was not in working condition and was not safe to operate. Klem's amended complaint contained two claims for cumulative trauma to his back and other body parts and two claims for injuries arising out of the November 10, 2003 incident.

{¶ 9} Klem and Conrail filed opposing motions for summary judgment. Conrail asked that Klem's first and second claims, for cumulative-trauma injuries to his back and other body parts, be dismissed, asserting that Klem had failed to submit any evidence that Conrail was negligent under FELA or that defendants had violated any regulation of the LIA. Klem argued that the deposition of Dr. Todd Jaeblon raised genuine issues of material fact. Conrail countered that the deposition was speculative and conclusory and should be stricken. The trial court agreed with Conrail, dismissing Klem's first and second claims.

{¶ 10} Klem's motion for summary judgment addressed the third and fourth claims, for injury arising from the November 10, 2003 incident, asserting that the independent brake was defective and that Conrail is strictly liable under the LIA. Conrail countered that the locomotive was not "in use" at that time and that the alleged defect did not create an unnecessary danger of personal injury. The trial court held that the locomotive was "in use" at the time of the November 10, 2003 accident and that the accident was the cause of Klem's injuries. However, the

trial court also held that genuine issues of material fact existed as to whether the alleged defect created an unnecessary danger of personal injury. Therefore, the only issue before the jury, according to the trial court, was whether Conrail had breached its duty to keep the independent brake in proper condition and safe to operate without unnecessary danger of personal injury.

{¶ 11} At trial, Duhadway admitted that the locomotive's independent brake "was not working as intended." Asserting that the testimony reflected that the independent brake had not been functioning properly and was binding upon Conrail, Klem moved for a directed verdict at the close of Conrail's case. The trial court denied the motion. Klem also asked that the trial court include an instruction that mirrored Section 229.46, Title 49, C.F.R., a specific regulation concerning the condition of the independent brake under the Federal Railroad Administration ("FRA"). Klem argued that the testimony made clear that the independent brake did not "operate as intended." The trial court refused to include that instruction to the jury.

{¶ 12} The jury returned a verdict in favor of Conrail. The jury also determined that Conrail was not negligent. Klem filed posttrial motions seeking a judgment notwithstanding the verdict (and in the alternative, for a new trial), and a motion to amend the complaint to conform to the evidence. The trial court denied both. Klem appealed.

## II. JUDGMENT NOTWITHSTANDING THE VERDICT

{¶ 13} In his first assignment of error, Klem contends:

{¶ 14} "The trial court erred in denying Klem's motion for judgment n.o.v. on his Locomotive Inspection Act claim."

{¶ 15} As stated by the Supreme Court of Ohio:

{¶ 16} "The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict." *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 504 N.E.2d 19.

{¶ 17} In *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 109, 592 N.E.2d 828, the Supreme Court of Ohio set forth the standard for granting a directed verdict. The court stated:

{¶ 18} "The strict standard for granting a directed verdict is found in Civ.R. 50(A)(4): 'When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted

and that conclusion is adverse to such party, the court shall sustain the motion * * *.' "

{¶ 19} In *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 423 N.E.2d 467, the court explained this standard: "When considering a motion for a directed verdict, a trial court must construe the evidence most strongly in favor of the party against whom the motion is directed. * * *

{¶ 20} " * * *

{¶ 21} "The law in Ohio regarding directed verdicts is well formulated. * * * Thus, 'if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. *Kellerman v. J.S. Durig Co.* (1964), 176 Ohio St. 320 [27 O.O.2d 241, 199 N.E.2d 562].' *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115 [4 O.O.3d 243, 363 N.E.2d 367]." See *Wells v. Miami Valley Hosp.* (1993), 90 Ohio App.3d 840, 631 N.E.2d 642.

{¶ 22} A motion for directed verdict presents a question of law. A court shall not grant a directed verdict when the record contains sufficient evidence going to all the essential elements of the case. *Wagner v. Roche Laboratories* (1996), 77 Ohio St.3d 116, 671 N.E.2d 252. In ruling upon the motion, the trial court may not weigh the evidence. Id.

{¶ 23} Klem asserts that he is entitled to a judgment notwithstanding the verdict because of Duhadway's admission that the locomotive was not in proper condition or safe to operate. Klem argues that Duhadway's admission that the independent brake "hesitated" establishes that (1) Conrail failed to comply with regulations promulgated under the FRA requiring that the independent brake "operate as intended" and (2) Conrail violated the LIA when it breached its broad duty to keep the locomotive's parts and appurtenances in proper condition and safe to operate without unnecessary danger of personal injury. See Section 20701(1), Title 49, U.S.Code.

{¶ 24} Conrail counters that Klem never pleaded with specificity any regulation under the FRA and insists that the only issue before the jury was Conrail's compliance with the broad duty of the LIA, requiring that "[a] railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances * * * are in proper condition and safe to operate without unnecessary danger of personal injury." Section 20701(1), Title 49, U.S.Code. Conrail asserts that Klem had to demonstrate that the locomotive's "parts and appurtenances" were not "in [a] proper condition and safe to operate without unnecessary danger of personal injury" and insists that Klem failed to do so. Cf. Section 229.7, Title 49, C.F.R.

{¶ 25} We disagree with the argument set forth by Conrail, but also disagree with Klem's argument for a judgment notwithstanding the verdict. Duhadway's testimony must be considered as an issue of fact to be weighted, not as a matter of law; and as an issue of fact, it cannot then support a directed verdict.

{¶ 26} Our analysis begins with the regulations governing interstate railroads and ends with Conrail's and Klem's arguments regarding their application to this case.

{¶ 27} The LIA, the FELA, and the FRA provide the guiding statutes relevant to the present case. At the outset, the LIA and FELA should be read together as companion statutes. *Baltimore & Ohio RR. Co. v. Groeger* (1925), 266 U.S. 521, 528, 45 S.Ct. 169, 69 L.Ed. 419. The LIA supplements the FELA by imposing on interstate railroads a duty to provide safe equipment. Id. Because the LIA does not create an independent cause of action for personal injuries, injured parties rely on the FELA to recover damages caused by an LIA violation. *Matson v. Burlington N. Santa Fe RR.* (C.A.10, 2001), 240 F.3d 1233, 1235. Although the statutes are closely intertwined, they have different standards. Therefore, they require separate analyses.

A. The Federal Employers' Liability Act

{¶ 28} The FELA provides that "[e]very common carrier by railroad while engaging in [interstate] commerce * * * shall be liable * * * to any person suffering injury while he is employed by such carrier in such commerce * * * for such injury or death resulting in whole or in part from the [carrier's] negligence." Section 51, Title 45, U.S.Code.

{¶ 29} To recover damages under the FELA, the plaintiff's injury must occur while he is acting within the scope of his employment and in furtherance of the employer's interstate business. See *Green v. River Terminal Ry. Co.* (C.A.6, 1985), 763 F.2d 805, 808. The employer's negligent conduct must also play a role in causing the employee's injury. Id.

{¶ 30} Congress enacted the FELA as a "broad remedial statute" to assist railroad employees when an employer's negligence causes injury. *Atchison, Topeka & Santa Fe Ry. Co. v. Buell* (1987), 480 U.S. 557, 561–562, 107 S.Ct. 1410, 94 L.Ed.2d 563. The FELA is a "response to the special needs of railroad workers who are daily exposed to the risks inherent in railroad work and are helpless to provide adequately for their own safety." *Sinkler v. Missouri Pacific RR. Co.* (1958), 356 U.S. 326, 329, 78 S.Ct. 758, 2 L.Ed.2d 799. The FELA is intended to be read liberally in favor of injured railroad employees. *Urie v. Thompson* (1949), 337 U.S. 163, 180, 69 S.Ct. 1018, 93 L.Ed. 1282. Under the

FELA, the employer's duty is nondelegable. *Shenker v. Baltimore & Ohio RR.* (1963), 374 U.S. 1, 7, 83 S.Ct. 1667, 10 L.Ed.2d 709.

### B. The Locomotive Inspection Act

{¶ 31} Congress enacted the LIA to promote the safety of railroad employees.[1] *Matson v. Burlington N. Santa Fe RR.*, 240 F.3d at 1235. The LIA imposes strict liability on railroad carriers for violating the act's safety standards. Id. See *Urie* at 188–190.

{¶ 32} The LIA differs from the FELA in that the LIA does not confer any right of action on injured employees. *Urie*, 337 U.S. at 188, 69 S.Ct. 1018, 93 L.Ed. 1282. The United States Supreme Court has construed the LIA to be an amendment to the FELA, so that "proof of [an LIA violation] is effective to show negligence as a matter of law" under the FELA. *Urie* at 189. The prime purpose of both the FELA and the LIA is "the protection of railroad employees * * * from injury due to industrial accident," *Urie* at 191, and the LIA is "to be read and applied with the [FELA]," *Baltimore & Ohio RR. v. Groeger*, 266 U.S. at 528, 45 S.Ct. 169, 69 L.Ed. 419. The FRA may promulgate regulations implementing the requirements of the LIA. Section 20103, Title 49, U.S.Code; Section 1.49(c)(5), (g), Title 49, C.F.R.

{¶ 33} The LIA contains a broad duty to maintain equipment in good and safe working order: "A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances * * * are in proper condition and safe to operate without unnecessary danger of personal injury." Section 20701, Title 49, U.S.Code. The LIA regulations also include this broad duty. See Section 229.7, Title 49, C.F.R. (requiring a locomotive and its appurtenances to be "in proper condition and safe to operate in the service to which they are put, without unnecessary peril to life or limb"); Section 229.45, Title 49, C.F.R. (requiring that "[a]ll systems and components on a locomotive * * * be free of conditions that endanger the safety of the crew * * *"). These two regulations impose upon railroads a general duty to maintain its parts and appurtenances. *Lilly v. Grand Trunk W. RR.* (1943), 317 U.S. 481, 485, 63 S.Ct. 347, 87 L.Ed. 411; see *Engvall v. Soo Line RR.* (Minn.2000), 605 N.W.2d 738, 739, fn. 1 (noting that the LIA "imposes an absolute requirement that employers provide safe equipment"); see also *Herold v. Burlington N., Inc.* (C.A.8 1985), 761 F.2d 1241, 1246.

{¶ 34} A railroad can violate the LIA by either (1) breaching the aforementioned broad duty to keep its locomotives' "parts and appurtenances * * * in

---

1. The LIA is the former Boiler Inspection Act ("BIA"), Section 23, Title 45, U.S.Code.

proper condition and safe to operate without unnecessary danger of personal injury" or (2) failing to comply with additional specific regulations issued by the FRA. Section 20701(1), Title 49, U.S.Code; *McGinn v. Burlington N. RR. Co.* (C.A.7, 1996), 102 F.3d 295, 298–299; *Herold v. Burlington N., Inc.* at 1246. See also *Hager v. Norfolk & W. Ry. Co.*, 8th Dist. No. 87553, 2006-Ohio-6580, 2006 WL 3634373, ¶ 31, citing *Mosco v. Baltimore & Ohio RR.* (C.A.4, 1987), 817 F.2d 1088, 1091; *Reed v. Norfolk S. Ry. Co.* (N.D.Ohio 2004), 312 F.Supp.2d 924, 926.

{¶ 35} It is the failure to comply with a specific regulation issued by the FRA that is relevant to our analysis. Conrail's broad duty to maintain equipment in good and safe working order under the LIA has already been addressed by the jury.

## C. The Federal Railroad Administration Regulation

{¶ 36} The FRA regulation provides that the responsibility for safe equipment precedes the use of the equipment. The regulation imposes upon Conrail a duty to isolate and identify problems with the equipment before it is used instead of imposing a duty to correct the equipment condition only after some showing of a problem that it knew about, but did not fix.

{¶ 37} The FRA requires that all equipment be checked prior to use, and here, the trial court ruled that the locomotive was "in use." Thus, it is presumed that the locomotive was checked before use and that Conrail is strictly liable for any defect discovered after the locomotive was put in use. Section 229.46, Title 49, C.F.R. provides: "The carrier *shall know before each trip* that the locomotive brakes and devices for regulating all pressures, including but not limited to the automatic and independent brake valves, *operate as intended* and that the water and oil have been drained from the air brake system." (Emphasis added.) Thus, Klem needed only to show proof that Conrail failed to comply with a regulation issued by the FRA in order to show negligence as a matter of law.[2]

{¶ 38} Conrail argues that we cannot address whether this specific provision of the LIA was violated because Klem failed to specifically assert a violation of this regulation in the pleading. Conrail also maintains that even if the independent brake did not work as intended, the jury concluded that it did not create an unnecessary danger of injury.

---

2. The secretary of transportation, acting through the FRA, may promulgate regulations to implement the requirements of the LIA. Section 20103, Title 49, U.S.Code (1994); Section 1.49(c)(5), (g), Title 49, C.F.R. (2000). The Interstate Commerce Commission ("ICC") originally regulated locomotives and other railroad equipment, but its authority was transferred to the secretary of transportation in 1966. Pub.L. No. 89–670, Section 6(e)(1), 80 Stat. 931 (Oct. 15, 1966); see *Napier v. Atlantic Coast Line RR.*, 272 U.S. 605, 608, 47 S.Ct. 207, 71 L.Ed. 432 (1926).

{¶ 39} Klem did not need to specifically assert a violation of Section 229.46, Title 49, C.F.R. Conrail is strictly liable for any defect that constitutes a violation of the LIA. But here, the question of whether the independent brake "operate[d] as intended" was not put before the jury. The jury concluded only that the locomotive and all of its parts and appurtenances were in "proper condition" and "safe to operate without unnecessary danger of personal injury." Section 20701(1), Title 49, U.S.Code.

### D. The Complaint was Sufficient

 {¶ 40} In his amended complaint, Klem alleged violations of only the FELA and the LIA. Although Klem did not allege a specific violation under the FRA, his complaint revolves around a singular defect—the independent brake on board the locomotive did not function properly; it froze and locked up. His claims that he had suffered cumulative trauma to his back and other body parts were dismissed by the trial court during summary judgment. Therefore, Conrail clearly knew that the independent brake on board the locomotive was the only defect alleged that remained following summary judgment. Conrail is a railroad that has considerable experience with the FELA, LIA, and FRA. To assert otherwise would be disingenuous.

{¶ 41} More important, claims brought under the FELA and LIA do not need to comply with Civ.R. 9. It is sufficient that the complaint place Conrail on notice of the basis of the claim, permitting it to prepare· a responsive pleading. Although Klem did not highlight Section 229.46, Title 49, C.F.R. in his complaint or pleadings as supporting his allegation that there was a violation of the LIA, his failure to do so did not constitute noncompliance with the rule. Certainly, had Klem argued the specific regulation earlier in the proceedings, he might have been in a better position to convince the jury that a violation of the LIA had occurred, because violation of this specific regulation does not also require that he demonstrate that the defect involved "unnecessary danger of personal injury." Section 20701(1), Title 49, U.S.Code.

### E. Operate as Intended

 {¶ 42} Klem testified that the independent brake froze or got stuck when he used it. Section 229.46, Title 49, C.F.R. provides that "the locomotive brakes and devices for regulating all pressures, including but not limited to the automatic and independent brake valves, *operate as intended* * * *." (Emphasis added.) The question is whether the brake "operated as intended." This phrase has not been defined in the LIA or its predecessor statute, the Federal Boiler Inspection Act ("BIA"), Sections 20701–20703, Title 49, U.S.Code.

{¶ 43} However, courts have addressed the use of locomotive and train brakes under a number of statutes, including the Safety Appliance Act of 1910 ("SAA"), Section 1, Title 45, U.S.Code, the Federal Safety Appliances Act ("FSAA"), Sections 20301–20306, Title 49, U.S.Code, and the BIA. Similar to the FELA and LIA, the SAA, FSAA, and BIA imposed strict liability on railroad carriers for violations of its safety standards. The SAA required that all cars be equipped with efficient hand brakes. Section 1, Title 45, U.S.Code. The FSAA imposed an absolute duty on railroads to provide and maintain certain safety systems, including power-braking systems. *Myers v. Reading Co.* (1947), 331 U.S. 477, 485, 67 S.Ct. 1334, 91 L.Ed. 1615; *O'Donnell v. Elgin, Joliet & E. Ry. Co.* (1949), 338 U.S. 384, 390, 70 S.Ct. 200, 94 L.Ed. 187. The BIA, now the LIA, required that brakes "operate as intended." We presume that a brake that operates as intended is also one that operates efficiently.

{¶ 44} Whether a railroad failed to equip its train with efficient brakes is a question for the jury. *Texas & Pacific Ry. Co. v. Griffith* (C.A.5, 1959), 265 F.2d 489. In *Myers v. Reading Co.*, the Supreme Court of the United States observed that "[a] railroad * * * may be found liable if the jury reasonably can infer from the evidence * * * that the hand brake * * * was not an 'efficient' hand brake." Id. at 482–483.

{¶ 45} According to *Myers,* "There are two recognized methods of showing the inefficiency of hand brakes equipment. Evidence may be adduced to establish some particular defect, or the same inefficiency may be established by showing a failure to function, when operated with due care, in the normal, natural, and usual manner." *Myers* at 485; *Didinger v. Pennsylvania RR. Co.* (C.A.6, 1930), 39 F.2d 798, 799.

{¶ 46} The court in *Myers* held: "Proof of an actual break or visible defect in a coupling appliance is not a prerequisite to a finding that the statute has been violated. Where a jury finds that there is a violation, it will be sustained, if there is proof that the mechanism failed to work efficiently and properly even though it worked efficiently both before and after the occasion in question. The test in fact is the performance of the appliance. *Philadelphia & R.R. Co. v. Auchenbach* (3rd Cir.1926), 16 F.2d 550. Efficient means adequate in performance; producing properly a desired effect. Inefficient means not producing or not capable of producing the desired effect; incapable; incompetent; inadequate." *Myers v. Reading Co.,* 331 U.S. at 485, 67 S.Ct. 1334, 91 L.Ed. 1615.

{¶ 47} Next, the court in *Myers* held: "[T]he testimony of plaintiff that the brake was used in the normal and usual manner and failed to work efficiently but did so inefficiently, throwing him to the ground, is such substantial evidence of inefficiency as to make an issue for the jury. *Detroit, [Toledo & Ironton RR.] Co. v. Hahn,* [(C.A.6, 1931)], 47 F.2d 59." *Myers* at 485.

{¶ 48} In *Myers*, the questions at issue were questions of fact. The jury was required to draw inferences from the evidence. From the evidence presented, the jury concluded (1) that the brake was not an efficient brake and (2) that the fact that the brake was not an efficient brake contributed to or caused injury to the petitioner.

{¶ 49} Here, Klem testified that the independent brake did not work when he tried it. Testimony also showed that several other Conrail employees tried using the independent brake and had difficulty with it. Duhadway conceded that a "hesitation" meant that the independent brake was not operating as intended. The locomotive was taken out of service and "blue flagged," indicating that there must be a problem with it.

■ {¶ 50} Although the jury in this case concluded that the locomotive and all of its parts and appurtenances were in proper condition and safe to operate without unnecessary danger of personal injury, it did not address specifically whether the independent brake was "operating as intended." Section 20701(1), Title 49, U.S.Code. Had the jury considered the issue and found that the independent brake did not "operate as intended," yet reached a verdict in favor of Conrail, Klem would have been correct in seeking a judgment notwithstanding the verdict. A violation of Section 229.46, Title 49 C.F.R., is by statute a violation of the LIA. A judgment notwithstanding the verdict, however, cannot remedy a situation when the jury did not address an issue of fact.

{¶ 51} Accordingly, Klem's first assignment of error is not well taken.

### III. REFUSAL TO INCLUDE JURY INSTRUCTION

■ {¶ 52} In his second assignment of error, Klem contends:

{¶ 53} "The trial court erred in failing to instruct the jury relative to a violation of a locomotive inspection act regulation, 49 C.F.R. § 229.46."

{¶ 54} Klem asserts that he was entitled to a jury instruction based upon Duhadway's admission that the brake did not operate as intended because of the "hesitation" of the independent brake lever.

{¶ 55} Conrail advances three arguments why the trial court's refusal to submit Klem's proposed instruction was not an abuse of discretion. First, Conrail argues that Klem never specifically argued a violation of Section 229.46, Title 49, C.F.R. Next, Conrail argues that there was no testimony about Section 229.46, Title 49, C.F.R. Finally, Conrail asserts that "an LIA violation is only established if there is both a defect and a safety hazard."

{¶ 56} We disagree and find that the trial court's refusal to give the proposed jury instruction and interrogatory was reversible error.

{¶ 57} A trial court is not obliged to give a proposed instruction merely because counsel submitted it. *Jenkins v. Clark* (1982), 7 Ohio App.3d 93, 7 OBR 124, 454 N.E.2d 541. However, requested jury instructions should be given if they are correct statements of the law applicable to the facts of the case and reasonable minds could reach the conclusion sought by the instruction. *Murphy v. Carrollton Mfg. Co.* (1991), 61 Ohio St.3d 585, 591, 575 N.E.2d 828.

{¶ 58} To show reversible error, the proponent of the error must make a two-part showing. First, he must show that the trial court's refusal to give a proposed jury instruction was an abuse of discretion; that is, the refusal was arbitrary, unreasonable, or unconscionable. See *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140. Second, the proponent must demonstrate that he was prejudiced by the court's refusal to give the proposed instruction. Prejudicial error occurs only if the alleged instructional flaw cripples the entire jury charge. Cf. *State v. Penson* (Feb. 26, 1990), 2d Dist. No. 9193, 1990 WL 19395; *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 24 O.O.3d 316, 436 N.E.2d 1001; *Wagenheim v. Alexander Grant & Co.* (1983), 19 Ohio App.3d 7, 19 OBR 71, 482 N.E.2d 955.

{¶ 59} Because Klem did not need to specify Section 229.46, Title 49, C.F.R. in the pleadings, we reject Conrail's argument that Klem is not entitled to a jury instruction simply because the specific regulation or its language was not mentioned during the trial. Klem could have also chosen to pursue only a violation based on Conrail's broad duty to maintain. But given the fact that the issue at trial was the independent brake, the question of whether the brake "operated as intended" could easily have affected the jury's determination of whether an efficient brake that "operate[d] as intended" was also in "proper condition."

{¶ 60} Conrail's argument that the jury instruction is not needed because "an LIA violation is only established if there is both a defect and a safety hazard" reflects only a portion of the LIA. As mentioned, a railroad can violate the LIA by either (1) failing to comply with regulations issued by the FRA or (2) breaching the broad duty to keep its locomotive's parts and appurtenances in proper condition and safe to operate without unnecessary danger of personal injury. As to Conrail's broad duty to maintain, it is correct that Klem must prove both that the independent brake was not in proper condition and that it was not safe to operate without unnecessary danger of personal injury.

{¶ 61} Having rejected Conrail's arguments against Klem's jury instruction and interrogatory, we find that Klem was entitled to argue that the independent brake was not in efficient working condition and did not operate as intended. Klem's allegation that the independent brake was not in efficient working condition can be applied either to the specific FRA regulation or to Conrail's

broad duty to maintain. Thus, Klem has demonstrated that the trial court's refusal to give a proposed jury instruction was an abuse of discretion. As well, Klem has demonstrated prejudice resulting from the court's refusal to give the proposed instruction. The absence of this instruction meant that the jury would consider only whether the independent brake was in proper condition—meaning that it worked—even if it didn't "operate as intended."

{¶ 62} Accordingly, we find Klem's second assignment of error well taken. Klem is entitled to a new trial.

## IV. REFUSAL TO ALLOW WITNESS

{¶ 63} In his third assignment of error, Klem maintains:

{¶ 64} "The trial court erred in refusing to allow witness Darrell McCabe to testify on behalf of Plaintiff during Plaintiff's case in chief, thus entitling Plaintiff to a new trial."

{¶ 65} At trial, Klem attempted to call McCabe as a witness during his case in chief, even though he had not listed McCabe as a trial witness until three weeks before trial. Conrail objected, contending that permitting McCabe to testify would constitute trial by ambush. In response, Klem argued that no surprise existed; McCabe was an individual known to Conrail, with knowledge relevant to the incident, and he should have been disclosed by Conrail in its responses to Klem's interrogatories and requests for discovery. Klem complains that Conrail's failure to disclose McCabe is evidence of its dilatory conduct.

{¶ 66} McCabe is, as Conrail concedes in its brief, a former employee who secured the event recorder (speed tape) from the locomotive following the incident. McCabe averred in his affidavit that his regular duties with Conrail included investigating breakdowns on locomotives or any injuries arising as a result of these breakdowns, and he had been involved in the investigation into the incident on board Klem's locomotive. McCabe stated that he had included his personal observations and findings in a report concerning the incident to the superintendent and the corporate-claims department in New Jersey. Klem asserts that given the extent of McCabe's involvement, there is no reason why Conrail did not disclose McCabe in its responses to Klem's interrogatories.

{¶ 67} Conrail disclosed six witnesses—the individual who assisted in obtaining the answers to the interrogatories and the following: Tom Szpond, trainmaster; Ralph C. Sturgall, crewmember; Dan F. Books, crewmember/brakeman; Howard Scott, yardmaster; and Bob Tondors, conductor. Only two were working with Klem at the time of the incident. Duhadway and McCabe were not among those identified by Conrail.

{¶ 68} Klem claims that Conrail knew of McCabe and his role in the investigation. Once Klem became aware of McCabe, he attempted to locate McCabe, who was retired and living in Tennessee. Klem asserts that he disclosed McCabe as soon as he realized the potential importance of McCabe's testimony and insists that he should not be punished for Conrail's neglect in identifying those involved in the investigation.

{¶ 69} We agree that McCabe should have been allowed to testify.

{¶ 70} McCabe's involvement was known to Conrail. The significance of McCabe's testimony was at least equal to, if not greater than, that of the individuals named in the interrogatory. Civ.R. 26(B)(1) provides, "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the * * * identity and location of persons having knowledge of any discoverable matter." The obligation to supplement discovery is set forth in Civ.R. 26(E)(1), which provides, "A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (a) the identity and location of persons having knowledge of discoverable matters * * *."

{¶ 71} The civil rules were designed to provide for full discovery of all pertinent nonprivileged evidence and to allow both parties to accurately assess the merits of their cases prior to trial. *Bailey v. Bailey*, 12th Dist. No. CA2004-02-017, 2004-Ohio-6930, 2004 WL 2937418, ¶ 31, citing *Jones v. Murphy* (1984), 12 Ohio St.3d 84, 86, 12 OBR 73, 465 N.E.2d 444. See *Nead v. Brown Cty. Gen. Hosp.*, 12th Dist. No. CA2005-09-018, 2007-Ohio-2443, 2007 WL 1461303, ¶ 15.

{¶ 72} Conrail argues that a continuance should have been requested once McCabe's identity was discovered by Klem. Conrail contends that Klem's failure to do so precludes him from obtaining relief pursuant to Civ.R. 59(A)(1) based on an irregularity in the proceedings. See *Allin v. Hartzell Propeller, Inc.*, 161 Ohio App.3d 358, 2005-Ohio-2751, 830 N.E.2d 413, ¶ 14 (consumer's failure to seek continuance in order to properly serve witness waived his right to complain that irregularity chargeable to court prevented him from having fair trial). Conrail's reliance on *Allin* is misplaced. A continuance was not needed to secure a witness. McCabe was ready and available to testify. Rather, the issue was Conrail's failure to disclose McCabe in its responses to Klem's interrogatories.

{¶ 73} The determination of whether a surprise or unannounced witness may testify is within the sound discretion of the trial judge, *Peyton v. Commonwealth of Kentucky* (Ky.2008), 253 S.W.3d 504, certiorari denied (2008), — U.S. —, 129 S.Ct. 604, 172 L.Ed.2d 463, and is reviewed for an abuse of discretion. *Nakoff v. Fairview Gen. Hosp.* (1996), 75 Ohio St.3d 254, 662 N.E.2d

1, syllabus; *Vaught v. Cleveland Clinic Found.*, 98 Ohio St.3d 485, 2003-Ohio-2181, 787 N.E.2d 631, ¶ 13; see *Yaeger v. Fairview Gen. Hosp.* (Mar. 11, 1999), 8th Dist. No. 72361, 1999 WL 135265.

{¶ 74} The determination of whether the testimony results in a surprise at trial is a matter left to the sound discretion of the trial court. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 194, 559 N.E.2d 1313. In the absence of surprise, there is no abuse of discretion. *Long v. Isakov* (1989), 58 Ohio App.3d 46, 51, 568 N.E.2d 707. Further, when a complaining party knows or should have known the identity of the other witness and the general nature of his testimony, a party cannot complain that they have been ambushed. See *Kalina v. Sagen* (Mar. 26, 1992), 8th Dist. No. 59761, 1992 WL 62180; *Cherovsky v. St. Luke's Hosp. of Cleveland* (Dec. 14, 1995), 8th Dist. No. 68326, 1995 WL 739608. A judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice. *O'Brien v. Angley*, 63 Ohio St.2d 159, 164–165, 17 O.O.3d 98, 407 N.E.2d 490

{¶ 75} Klem asserts that the trial court's decision to preclude McCabe from testifying was prejudicial and reversible error. Specifically, Klem contends that McCabe would testify to his knowledge of the investigation into the incident and the information that was collected, and to prevent McCabe from doing so would be prejudicial to Klem.

{¶ 76} The trial court abused its discretion in precluding the testimony of McCabe based on the lateness of disclosure, which was no fault of Klem's and was clearly the result of Conrail's own conduct. Conrail knew of, or should have known of, McCabe's existence and the nature of his testimony. Thus, Conrail cannot claim that it was surprised. Any surprise would be a direct result of its own refusal to acknowledge the witness and his potential testimony. There is no requirement that mandates exclusion of McCabe's testimony. See *Jones v. Murphy* (1984), 12 Ohio St.3d 84, 12 OBR 73, 465 N.E.2d 444, syllabus. McCabe's testimony would have specifically addressed Conrail's investigation into the incident of November 10, 2003.

{¶ 77} Therefore, Klem's third assignment of error is well taken.

## V. REFUSAL TO ALLOW REBUTTAL WITNESS

{¶ 78} In his fourth assignment of error, Klem maintains:

{¶ 79} "The trial court erred in refusing to allow witness Darell McCabe to testify on behalf of Plaintiff in rebuttal, thus entitling Plaintiff to a new trial."

{¶ 80} Klem asserts that it has an unconditional right to present a rebuttal witness. Conrail counters that McCabe was not a rebuttal witness "since his

proffered testimony *primarily* related to matters raised not by Conrail, but by Klem and was otherwise cumulative." (Emphasis added.)

{¶ 81} Conrail contends that the trial court properly prevented McCabe from testifying because McCabe's testimony would be cumulative and, thus, unnecessary.

{¶ 82} We find that the trial court abused its discretion. McCabe should have been allowed to testify as a rebuttal witness as to those matters first addressed in Conrail's case-in-chief. Klem did not need to list McCabe as a rebuttal witness.

{¶ 83} In *Phung v. Waste Mgt., Inc.* (1994), 71 Ohio St.3d 408, 410, 644 N.E.2d 286, the Supreme Court of Ohio held: "A party has an unconditional right to present rebuttal testimony on matters which are first addressed in an opponent's case-in-chief and should not be brought in the rebutting party's case-in-chief." See *Weimer v. Anzevino* (1997), 122 Ohio App.3d 720, 726, 702 N.E.2d 940 (appellant may rebut evidence adverse to her side, but that evidence must be introduced by the opposing party and not by appellant herself). See also *Katz v. Enzer* (1985), 29 Ohio App.3d 118, 29 OBR 133, 504 N.E.2d 427.

{¶ 84} The proper scope of rebuttal testimony lies within the sound discretion of the trial court. *State v. Vails* (1970), 22 Ohio St.2d 103, 105–106, 51 O.O.2d 133, 258 N.E.2d 225; *O'Brien v. Angley,* 63 Ohio St.2d at 164–165, 17 O.O.3d 98, 407 N.E.2d 490. Thus, a trial court's decision regarding the scope of rebuttal testimony will not be reversed unless the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Finnerty* (1989), 45 Ohio St.3d 104, 108, 543 N.E.2d 1233. See *In re Sadiku* (2000), 139 Ohio App.3d 263, 267, 743 N.E.2d 507. See also *Blakemore v. Blakemore,* 5 Ohio St.3d at 219, 5 OBR 481, 450 N.E.2d 1140. Further, "Even in the event of an abuse of discretion, a judgment will not be disturbed unless the abuse affected the substantial rights of the adverse party or is inconsistent with substantial justice." *Beard v. Meridia Huron Hosp.,* 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 20. *O'Brien v. Angley* at 164–165. It is based upon this standard that we review Klem's fourth assignment of error.

{¶ 85} Conrail argues that McCabe's testimony would have been cumulative because its witnesses James Kernans and William Honeycutt had agreed that the speed brake would not have recorded anything of material value. Conrail also argues that further testimony concerning Klem's violation of railroad rules would have been cumulative because "the jury found that Conrail was not negligent, the issue of Klem's contributory negligence was quite properly not even considered by the jury." In this case, Conrail's expert, Honeycutt, made clear that Klem's conduct contributed to his injury. Further, Conrail's witness, Kenny McIntyre, testified that he did not agree with McCabe's assessment regarding which safety

rules applied. Thus, whether Klem's conduct contributed to his injury or whether certain safety rules had been followed could clearly be rebutted by McCabe. Because McCabe's proffered rebuttal testimony counters Conrail's witnesses, McCabe's testimony could not be cumulative. Exclusion of McCabe's rebuttal testimony was prejudicial to Klem and therefore was an abuse of discretion.

{¶ 86} We find that Klem's fourth assignment of error is well taken.

## VI. REFUSAL TO DISMISS POTENTIAL JURORS FOR CAUSE

{¶ 87} In his fifth assignment of error, Klem maintains:

{¶ 88} "The trial court erred in refusing to dismiss potential jurors for cause during voir dire, thus entitling plaintiff to a new trial."

{¶ 89} Klem asserts that jurors McCullough and Poston should have been dismissed for cause because they had expressed a belief that Klem had assumed the risk of injury. Klem argues that assumption of the risk has been abolished under the FELA and therefore, any juror unable to set aside that belief should have been dismissed for cause.

{¶ 90} Conrail suggests that prospective jurors can be dismissed for cause only if they reveal by their answers that they cannot be fair and impartial or will not follow the law as given them by the court. Conrail asserts that the dismissal of a juror for cause is discretionary and subject to reversal only upon an abuse of discretion. Conrail contends that the trial court's decision not to exclude jurors McCullough and Poston should not be overturned because the trial court was in the best position to observe the demeanor of the prospective jurors and to evaluate their answers.

{¶ 91} We disagree.

{¶ 92} Jurors McCullough and Poston should have been dismissed for cause. Their responses that they could follow the law could not remove lingering doubts as to whether they could be entirely unbiased given their belief that Klem had assumed the risk.

{¶ 93} It is well recognized that the "right of trial by jury guaranteed by the Constitution carries with it by necessary implication the right that the jury be composed of unbiased and unprejudiced persons." *Papes v. King* (1964), 3 Ohio App.2d 232, 233, 32 O.O.2d 325, 202 N.E.2d 199, citing *Lingafelter v. Moore* (1917), 95 Ohio St. 384, 117 N.E. 16. See Section 5, Article I, Ohio Constitution.

{¶ 94} There is no constitutional provision pertaining to the selection and impaneling of a jury. However, the right of trial by jury guaranteed by the Constitution carries with it by necessary implication the right that the jury be

composed of unbiased and unprejudiced persons. Moreover, when the parties are entitled to a jury, the court is charged with the imperative duty of affording each party the opportunity of having an impartial jury. *Lingafelter v. Moore*. See *Papes v. King* at 233, and *Palmer v. State* (1885), 42 Ohio St. 596, 604.

{¶ 95} Juror challenges are controlled by two statutes, R.C. 2313.42 and 2313.43. R.C. 2313.42 provides as follows:

{¶ 96} "The following are good causes for challenge to any person called as a juror:

{¶ 97} " * * *

{¶ 98} "(J) That he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court.

{¶ 99} "Each challenge listed in this section shall be considered as a principal challenge, and its validity tried by the court."

{¶ 100} R.C. 2313.43 then provides:

{¶ 101} "In addition to the causes listed under section 2313.42 of the Revised Code, any petit juror may be challenged on suspicion of prejudice against or partiality for either party * * * or other cause that may render him at the time an unsuitable juror. The validity of such challenge shall be determined by the court and be sustained if the court has any doubt as to the juror's being entirely unbiased."

{¶ 102} Thus, R.C. 2313.42 and 2313.43 provide for the causes for which persons called as jurors may be challenged. Civ.R. 47(B) superseded former R.C. 2313.44, which was repealed in 1971, and provides, "In addition to challenges for cause provided by law, each party peremptorily may challenge three prospective jurors."

{¶ 103} In *Parusel v. Ewry*, 6th Dist. No. L–02–1402, 2004-Ohio-404, 2004 WL 190077, ¶ 36–37, this court observed that R.C. 2313.42(J) and 2313.43 "are reviewed on an abuse of discretion standard. The trial court's determination must be affirmed absent a finding by the appellate court that the trial court's attitude is arbitrary, unreasonable, or unconscionable." Id., citing *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301.

{¶ 104} In *McGarry v. Horlacher*, 149 Ohio App.3d 33, 2002-Ohio-3161, 775 N.E.2d 865, ¶ 14, the court held that "[t]he erroneous denial of a challenge for cause may be prejudicial because it forces a party to use a peremptory challenge on a prospective juror who should have been excused for cause, giving that party fewer peremptories than the law provides."

{¶ 105} In the present case, Klem challenged jurors McCullough and Poston for cause under R.C. 2313.42(J) and 2313.43. Klem argues that pursuant to R.C.

2313.42(J) and 2313.43, McCullough and Poston disclosed by their answers that they could not be fair and impartial jurors or entirely unbiased. A review of the transcript from the jury voir dire reveals that McCullough and Poston had difficulty setting aside the concept of assumption of the risk. McCullough's responses fluctuate from "There's other things," "That's difficult," and "I don't think it is good law necessarily," to "Probably," when asked whether it would make Klem's case harder to prove. Similarly, Poston's answers range from "You work there for a long time, you know what you're doing," "I think I can," "Probably, yes," to "I think I could, yeah."

{¶ 106} During voir dire, the following exchange took place between Klem's attorney E.J. Leizerman and McCullough:

{¶ 107} "MR. McCULLOUGH: * * * people are entitled to what they're entitled to as long as there has not been wrongdoing or if people are trying to get more for what they might have been entitled to.

{¶ 108} " * * *

{¶ 109} "MR. McCULLOUGH: There's other things * * * Anytime we do a job, we have a job, we want to be able to work as long as we can, but there's times where you might not physically be able to do the job you've been doing for a certain period of time. I mean, make it simple, like a football player in the NFL, they're entitled to whatever contract they've signed and negotiated for, and then once they feel—or once whoever is employing them says, you know, I don't think he can play anymore. Well, I want to play. Why can't I play? I should get that money I've been making. That's not the case. And eventually—and I think you can take that to any level of work. I mean, when you go to work you assume a responsibility and you assume a—basically a risk involved, too, with work, and then you have to understand that risk.

{¶ 110} "MR. LEIZERMAN: * * * In this case, if you were told that the law is that an employee in the United States never assumes the risk when it goes to work on a railroad, assumes no risk, if that is the law the Judge will tell you at the end of the case, can you accept that?

{¶ 111} "MR. McCULLOUGH: * * * That's difficult.

{¶ 112} " * * *

{¶ 113} "MR. LEIZERMAN: If you heard at the end of this case that the railroad employee does not assume the risk of the dangers of the railroad when it goes to work for the railroad, this is one of those laws that just you disagree with?

{¶ 114} "MR. McCULLOUGH: Yeah, I don't think that's a good law necessarily. I mean there should be some other protection involved. But that's the way it goes.

{¶ 115} "MR. LEIZERMAN: Having felt that way, would it make my job just a little more difficult for me to prove my case?

{¶ 116} "MR. McCULLOUGH: Probable—Potentially.

{¶ 117} "MR. LEIZERMAN: Probably?

{¶ 118} "MR. McCULLOUGH: Yeah."

{¶ 119} Later, the following exchange between Leizerman and juror Poston took place:

{¶ 120} "MR. LEIZERMAN: In this case, you're going to hear that John Klem claims the railroad violated federal laws with respect to maintenance and condition of locomotives and whether they were reasonably safe to operate and whether parts and appurtenances were properly functioning on them that resulted in his injuries. Is there anyone who would listen to that law but also say, I don't know, he chose to work for the railroad, he knows what the railroad is, he gets what happens? Anybody feel like that?

{¶ 121} "MR. POSTON: I do, honestly, I do. Forty-two years after working for the railroad and you get hurt? You work there a long time, you know what you're doing.

{¶ 122} "MR. LEIZERMAN: Right.

{¶ 123} "MR. POSTON: So yeah, I have that issue.

{¶ 124} "MR. LEIZERMAN: So if the Court said—asked you to assume that he never assumes the risk when working for the railroad, you disagree with that law?

{¶ 125} "MR. POSTON: Yes, I do.

{¶ 126} "MR. LEIZERMAN: And as a result it would make it far more difficult for me to convince you of Mr. Klem's rights?

{¶ 127} "MR. POSTON: Probably, yes.

{¶ 128} " * * *

{¶ 129} "MR. LEIZERMAN: Last thing * * * Dr. McCullough and Mr. Poston said that, at least on those issues, with assumption of the risk my job's going to be harder to prove our case simply because if that's the law, because of your beliefs; fair?

{¶ 130} "MR. POSTON: Yeah.

{¶ 131} "MR. McCULLOUGH: (indicating)."

{¶ 132} Conrail's counsel, Mr. Antonini, addressed the law concerning the assumption of the risk:

{¶ 133} "MR. ANTONINI: There was also some commentary on what the law is. And likewise where you've agreed to listen to the evidence, will you agree to listen to the law as the Judge gives it to you and not how the attorneys give it to you?

{¶ 134} "MR. ANTONINI: And in particular, Dr. McCullough and Mr. Poston, you guys were questioned at some length about your views on the jury system because of the law that Mr. Leizerman gave you this morning. Doctor, if—you are the kind of person that you are confident that you can listen to the law that the Judge gives to you and weigh that with the evidence and make a fair decision?

{¶ 135} "MR. McCULLOUGH: Yes.

{¶ 136} " * * *

{¶ 137} "MR. ANTONINI: And give you our kind of persuasion of what we think you should do based on the evidence, but you're confident you can sort through that, along with the group and apply the law that the Judge gives you?

{¶ 138} "MR. McCULLOUGH: Absolutely.

{¶ 139} "MR. ANTONINI: Mr. Poston, Likewise, are you the kind of person that can set aside what arguments, if they're not supported, that lawyers may make in this case and listen to the evidence and apply that to the law that the Judge gives you?

{¶ 140} "MR. POSTON: I think I can. His question to me was would his job be made tougher because of what he said. Yeah. That doesn't make my decision change, just makes his job tougher.

{¶ 141} "MR. ANTONINI: If the law was different than what he told you it was this morning and it had different—

{¶ 142} "MR. POSTON: There can only be one law, so I don't get what you're getting at there.

{¶ 143} "MR. ANTONINI: There are many, many other laws he did not talk about.

{¶ 144} "MR. POSTON: How do you interpret the law, I guess that's what you are asking?

{¶ 145} "MR. ANTONINI: Yeah. In other words, there was some questions this morning of you about duties and assumption of the risk. Those are things the Judge is going to tell you about. And it's not the job—in my view at least,

that's not my job to tell you until the Judge gives you the law. Will you listen to the law that the Judge gives you?

{¶ 146} "MR. POSTON: I think I could, yeah."

{¶ 147} Although Antonini attempted to rehabilitate McCullough and Poston, he did not specifically address whether they could set aside their belief that Klem had assumed the risk of injury by working for Conrail. Instead, Antonini's questions dealt primarily with whether jurors could apply the law as given. McCullough was not asked by Antonini whether he could set aside his beliefs about assumption of the risk and follow the law. Poston was clearly equivocal as to whether he could do so.

{¶ 148} The trial court rejected Klem's challenges for cause as to McCullough and Poston, observing, "I'm going to keep everybody on. I think they all equivocated, but I think that ultimately they all did say without equivocation, that they would follow the law and give a fair verdict. I mean everybody comes with their baggage, and we all appreciate that, and I don't think there's any undue prejudice with any of these potential jurors. So we're on to peremptory challenges. Anybody else for cause?"

{¶ 149} Klem asserts that he was prejudiced by the trial court's denial of his challenge for cause. The denial prejudiced him, he contends, because he was required to use a peremptory challenge to prevent McCullough and Poston from being seated on the jury and, therefore, was deprived of the opportunity to use a peremptory challenge to remove other jurors from the venire.

{¶ 150} A review of Ohio cases is helpful in determining whether McCullough and Poston's responses erased any lingering doubts regarding whether they could be entirely unbiased given their belief that Klem had assumed the risk.

{¶ 151} At the outset, trial courts have discretion in determining a juror's ability to be impartial. *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 452 N.E.2d 1323; *State v. Nields* (2001), 93 Ohio St.3d 6, 20–21, 752 N.E.2d 859. R.C. 2313.42(J) contemplates that "good cause" exists for removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." A prospective juror who has been challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased." R.C. 2313.43. *Nields* at 20–21. See *State v. Allard* (1996), 75 Ohio St.3d 482, 495, 663 N.E.2d 1277. Thus, "[d]eference must be paid to the trial judge who sees and hears the juror." *Nields* at 21; *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 853, 83 L.Ed.2d 841, 853.

{¶ 152} Therefore, a "ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576, superseded by constitutional amendment on other grounds as stated in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668. Accord *State v. Williams* (1997) 79 Ohio St.3d 1, 8, 679 N.E.2d 646.

{¶ 153} When a juror equivocates or gives contradictory answers, "it is for the trial court to determine which answer reflects the juror's true state of mind." *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 66; *State v. Webb* (1994), 70 Ohio St.3d 325, 339, 638 N.E.2d 1023; *State v. Jones* (2001), 91 Ohio St.3d 335, 339, 744 N.E.2d 1163. However, the trial judge need not accept the last answer elicited by counsel as the prospective juror's definitive word. See *State v. White* (1999), 85 Ohio St.3d 433, 439, 709 N.E.2d 140, citing *State v. Scott* (1986), 26 Ohio St.3d 92, 97–98, 26 OBR 79, 497 N.E.2d 55.

{¶ 154} But here, the trial court itself noted that McCullough and Poston's responses were "equivocal." Equivocal means "[h]aving a double or several meanings," Black's Law Dictionary (6th Ed.1990) 542. In other words, the trial court construed McCullough's and Poston's responses during voir dire as being ambiguous and from that, it could not make a determination whether McCullough and Poston were, or were not, impartial. The trial court did not ask questions designed to elicit definitive answers. It did not ask any questions. Since it did not, the trial court did not receive any answers consistent with its ultimate decision. An equivocal answer followed by an unequivocal answer does not equal a fair and impartial juror. Because there were no assurances from the prospective jurors to the court, the trial court abused its discretion when denying Klem's challenges for cause to jurors McCullough and Poston.

{¶ 155} Therefore, the trial court erred in determining that McCullough and Poston could put aside any biases or preconceived notions about assumption of the risk and confine their discussion of the case to just the evidence presented and render a verdict based on the instructions of law given by the court.

{¶ 156} In light of the uncertainty that remained regarding McCullough and Poston's ability to be entirely unbiased, we find that the trial court abused its discretion in denying Klem's motion to excuse McCullough and Poston from the jury for cause.

{¶ 157} The fifth assignment of error is therefore well taken.

## VII. LEAVE TO AMEND COMPLAINT

{¶ 158} In his sixth assignment of error, Klem maintains:

{¶ 159} "The trial court erred in denying Plaintiff's post-trial motion for leave to amend complaint to conform to the evidence."

{¶ 160} Klem asserts that his amended complaint more than adequately put Conrail on notice before trial that he was alleging a violation of the LIA and insists that Civ.R. 9 requires no more specificity than that which was pleaded.

{¶ 161} Conrail contends that an amendment at this stage would be substantially prejudicial, asserting that the trial court properly held that Klem had failed to raise any claim under Section 229.46, Title 49, C.F.R.

{¶ 162} We find that Klem is entitled to an order permitting him to amend his complaint because the issue of the independent brake was tried by implied consent of the parties and he is entitled to a new trial.

{¶ 163} Civ.R. 15(B), "Amendments to conform to the evidence," provides:

{¶ 164} "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment. Failure to amend as provided herein does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

{¶ 165} In *State ex rel. Evans v. Bainbridge Twp. Trustees* (1983), 5 Ohio St.3d 41, 5 OBR 99, 448 N.E.2d 1159, paragraph one of the syllabus, the Supreme Court of Ohio held: "An implied amendment of the pleadings under Civ.R. 15(B) will not be permitted where it results in substantial prejudice to a party. Various factors to be considered in determining whether the parties impliedly consented to litigate an issue include: whether they recognized that an unpleaded issue entered the case; whether the opposing party had a fair opportunity to address the tendered issue or would offer additional evidence if the case were to be tried on a different theory; and, whether the witnesses were subjected to extensive cross-examination on the issue."

{¶ 166} Conrail was clearly aware that an unpleaded issue had entered the case. Although the allegation of a defective independent brake was not raised in Klem's amended complaint, it was alleged that Conrail had breached its broad

duty to maintain the locomotive in proper condition. Therefore, it was alleged that Conrail had violated the LIA.

{¶ 167} From the very beginning of the lawsuit, Klem asserted that he was injured when the independent brake on board the locomotive failed and that he had cumulative injuries to his back and other body parts. These two distinct issues were addressed by the parties during summary judgment. As to those claims pertaining to Klem's back and other body parts, the trial court awarded judgment in favor of Conrail. The claims remaining after summary judgment concerned the injury Klem sustained to his thumb on November 10, 2003. The sole issue was the defect involving the independent brake. No other part or appurtenance on board the locomotive was alleged to have been defective or not working properly. Thus, it was clear that Klem was asserting a violation of the LIA based on a "defect" of the independent brake. Conrail's defense during summary judgment and at trial was directed at the alleged defect of the independent brake and its alleged failure to comply with the broad duty set forth by the LIA. The case was not tried on a different theory—indeed, there was only one theory: Conrail had failed to comply with the LIA. Thus, Conrail had every opportunity to subject the witnesses to extensive cross-examination on this issue.

{¶ 168} We also find that Klem is entitled to an order granting him leave to amend the complaint to conform to the evidence. Because we have ordered a new trial, Conrail suffers no prejudice from the addition of a claim under Section 229.46, Title 49, C.F.R., which highlights the mechanical operation of the independent brake and asks the jury to determine whether an independent brake that is "operating as intended" or "effectively," differs from an independent brake that is in "proper condition." The outcome could potentially change as a result of our decision that the trial court (1) erred in not permitting a jury instruction that mirrored Section 229.46, Title 49, C.F.R., (2) erred in prohibiting McCabe from testifying as a witness, (3) erred in prohibiting McCabe from testifying as a rebuttal witness, and (4) erred in refusing to dismiss potential jurors for cause.

{¶ 169} Since this matter is being remanded for a new trial, Conrail cannot show that an amendment of the complaint upon remand would be prejudicial. None of the factors in *Bainbridge*, 5 Ohio St.3d 41, 5 OBR 99, 448 N.E.2d 1159, apply to give rise to any substantial prejudice at this stage. Conrail is clearly aware that Klem can argue a violation of a specific regulation of the FRA as well as a violation of the LIA. Conrail will have fair opportunity to address the specific alleged violations of the FRA and the LIA. It will also have an opportunity to extensively cross-examine the witnesses on this issue.

{¶ 170} Based on the theory that cases ideally should be decided on their merits rather than on procedural technicalities, the rule articulates a liberal policy toward permitting amendments. *Stafford v. Aces & Eights Harley–Davidson, L.L.C.*, 12th Dist. No. CA2005–06–070, 2006-Ohio-1780, 2006 WL

902556; *Hall v. Bunn* (1984), 11 Ohio St.3d 118, 121, 11 OBR 417, 464 N.E.2d 516.

{¶ 171} Accordingly, we find Klem's sixth assignment of error well taken.

## VIII. CONCLUSION

{¶ 172} We conclude that the trial court did not err in refusing to grant appellant's motion for judgment notwithstanding the verdict, because the question of whether the locomotive was equipped with an independent brake that "operate[d] as intended," is a jury question. But, we conclude that the trial court erred when it failed to properly instruct the jury, refused to allow a witness to testify, refused to dismiss jurors for cause, and denied appellant leave to amend the complaint.

{¶ 173} Accordingly, appellant's first assignment of error is not well taken, but appellant's second, third, fourth, fifth, and sixth assignments of error are found to be well taken. Thus, we affirm in part and reverse in part, and we remand the cause for a new trial. Appellees are ordered to pay the costs of this appeal pursuant to App.R. 24.

{¶ 174} This decision and judgment supersedes and replaces the original decision and judgment filed June 18, 2010 (*Klem v. Consol. Rail Corp.*, Sixth Dist. No. L–09–1223, 2010-Ohio-2789).

> Judgment reversed in part
> and affirmed in part,
> and cause remanded.

PIETRYKOWSKI and SINGER, JJ., concur.

